**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| SARAH GOBLE, individually and as next friend of S.G. and F.B., minor children; and BRIAN BOXX, individually and as next friend of F.B., a minor child,<br><br>Plaintiffs,<br><br>v.<br><br>TERRA N. FRAZIER, D.O., in her individual capacity; RUAIRI E. SMITH-DEWEY, D.O., in her individual capacity; and THE CHILDREN'S MERCY HOSPITAL d/b/a CHILDREN'S MERCY KANSAS CITY,<br><br>Defendants. | Case No. _______________<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs Sarah Goble and Brian Boxx, "Plaintiffs," individually and as next friends of their minor children F.B. and S.G., for their Complaint against Defendants Terra N. Frazier, D.O., Ruairi E. Smith-Dewey, D.O., and The Children's Mercy Hospital, allege as follows:

## I. NATURE OF THE ACTION

1. This is a civil rights action under 42 U.S.C. § 1983 arising from the removal of two children, F.B. and S.G., from their parents, Sarah Goble and Brian Boxx, based on a diagnosis of child physical abuse rendered and maintained by Defendant Terra N. Frazier, D.O. ("Frazier"), Ruairi E. Smith-Dewey, D.O. ("Smith-Dewey"), and the Safety, Care and Nurturing ("SCAN") team they jointly supervised at Defendant The Children's Mercy Hospital ("CMH") in Kansas City.

2. On October 2, 2024, Plaintiffs brought their two-month-old son, F.B., to CMH because F.B. was unable to feed and had vomited material containing what appeared to be old blood.

3. Within approximately twenty-four hours of F.B.'s arrival, and before the medical workup was complete, the CMH SCAN team – acting under Defendants Frazier and Smith-Dewey – diagnosed F.B. as a victim of multiple occurrences of child physical abuse and communicated that diagnosis, in definitive and unqualified terms, to the Kansas Department for Children and Families ("DCF") and law enforcement.

4. Defendants Frazier and Smith-Dewey's joint conduct constituted an investigatory diagnosis – not a medical or clinical diagnosis. Defendants' forensic diagnosis was not medical or clinical, because its purpose was not to treat F.B.'s purported medical condition and, further, because the diagnoses omitted, contradicted, and suppressed material information in CMH's own medical records, including: the treating otolaryngologist's finding that F.B.'s throat lesion attributed to the parents was already healing and was days to a week old; the absence of any clinical symptoms associated with F.B.'s reported fractures; and the limitations and qualifications regarding the imaging stated by CMH's own radiologists.

5. Defendants diagnosed S.G. as a victim of child abuse even though there was no sign of any physical abuse and she had no medical or historical indicia of abuse.

6. Based on Defendants Frazier and Smith-Dewey's joint forensic diagnoses, both of Plaintiffs' children were seized pursuant to *ex parte* temporary custody orders entered on October 8, 2024. The children were kept out of their parents' custody and under State control for nearly a year. Kansas DCF ultimately reversed all findings against the parents as unsubstantiated, and the State court released both children and terminated its jurisdiction. No criminal charges were ever filed against either parent.

7. The conduct alleged here did not occur in a vacuum. As alleged below, Dr. Frazier is a leading member of the Ray E. Helfer Society ("Helfer Society"), the national professional and

lobbying organization for child abuse pediatricians, ("CAPs") and serves on the Editorial Board of *The Quarterly*, the Helfer Society's own publication that provides peer review of child abuse medical literature. On information and belief, Dr. Frazier brought to CMH's SCAN program, and implemented in F.B. and S.G.'s case, the Helfer Society's institutional approach to abuse determination – reaching a definitive diagnosis of inflicted trauma early; discounting and failing to investigate or rule out alternative medical explanations; stripping exculpatory information from underlying records; and declining to correct the diagnosis when later evidence undermined it.

8. The same basic plan, structure and pattern of conduct alleged here forms the basis of several other lawsuits against Helfer Society-affiliated CAPs in related federal litigation, including *Reynolds v. Harper*, No. 25-CV-754 (D. Minn.), *Ramirez v. Harper*, No. 25-CV-2266 (D. Minn.), *Sharon v. Harper*, No. 25-CV-04603 (D. Minn.), and *Marshall v. Harper*, No. 0:26-cv-03461 (D. Minn.). As alleged below, the approach developed by the Helfer Society was engineered to circumvent the diagnostic standards of the American Academy of Pediatrics – the body that promulgates the national clinical standards governing the child abuse pediatrics subspecialty – which require a thorough differential diagnosis and consideration of all available clinical data before a diagnosis of abuse.

9. The constitutional claims in this action are based on Defendants' pre-hearing investigative conduct, their materially misleading forensic conclusions and omissions, and the institutional policies and practices that caused those conclusions to become governmental evidence. The claims are not based on courtroom testimony or on the bare act of making a mandatory report.

## II. <u>JURISDICTION AND VENUE</u>

10. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), because Plaintiffs bring claims under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the United States Constitution.

11. This Court has supplemental jurisdiction over Plaintiffs' Kansas-law claims under 28 U.S.C. § 1367(a), because those claims arise from the same case or controversy and the same nucleus of operative facts.

12. This Court has personal jurisdiction over all Defendants. These Defendants maintained continuing contractual and operational relationships with Kansas DCF, trained Kansas child-protection personnel, accepted Kansas referrals, directed medical-forensic opinions into Kansas investigations and courts, purposefully directed the conduct alleged herein at Kansas residents and Kansas child-welfare and judicial proceedings, and knew their conduct would cause effects in Kansas.

13. Venue is proper in the District of Kansas under 28 U.S.C. § 1391(b)(2). A substantial part of the events and omissions giving rise to the claims occurred in Johnson County, Kansas, including the joint investigation, the filing of the child-in-need-of-care ("CINC") petitions, the entry of the custody orders, the seizure of the children, the restrictions on family contact, and the injuries to this Kansas family.

## III. PARTIES

14. Plaintiff Sarah Goble is an adult resident and citizen of Johnson County, Kansas. She is the natural mother of S.G. and F.B. She brings claims individually and as next friend of both children.

15. Plaintiff Brian Boxx is an adult resident and citizen of Johnson County, Kansas. He is the natural father of F.B. He brings claims individually and as next friend of F.B.

16. Plaintiff F.B. is a minor child, born in 2024, who resides in Kansas. At the time of the hospital admission at issue, he was approximately twelve weeks old. He appears through his parents and next friends.

17. Plaintiff S.G. is a minor child, born in 2015, and is F.B.'s half-sister. At the time of the events alleged here, she was nine years old and lived with Plaintiffs and F.B. She appears through her mother, Sarah, who is her next friend.

18. Defendant Terra N. Frazier, D.O. is a child abuse pediatrician employed by CMH. At all relevant times she was a senior and supervising physician on the CMH SCAN team. She consulted with and directed F.B.'s case along with Defendant Smith-Dewey. Defendant Frazier agreed with the findings, interpretation, impression, and plan, and approved, signed, and verified the inpatient SCAN consultation containing the diagnosis at issue. She thereafter participated in and approved the follow-up SCAN assessment. Although the SCAN consultation states that Dr. Frazier separately examined F.B., upon information and belief Dr. Frazier did not physically see or examine F.B. Upon information and belief, the statements in the SCAN records that she did so were false and were made for the purpose of bolstering the credibility of the SCAN report and its conclusions due to Defendant Frazier's standing, reputation and longevity in the Kansas City medical-legal community. She is sued in her individual capacity.

19. Defendant Ruairi E. Smith-Dewey, D.O. is a physician who at all relevant times served on the CMH SCAN team and, on information and belief, was the SCAN fellow training under Dr. Frazier's supervision. Dr. Smith-Dewey performed the inpatient SCAN consultation of F.B. and authored the diagnostic statements at its core. She personally communicated the diagnosis to DCF and law enforcement at the October 3, 2024 briefing, including the inventory of claimed fractures; the asserted injury mechanisms of "yanking, tugging and pulling," "smooshing," and

"blunt force trauma"; the representation that screening laboratory work for bleeding risk and bone fragility had excluded any underlying medical condition; and the representation that the SCAN team had "confirmed" that the laceration in F.B.'s throat was caused within a window in which the parents were the only caretakers. Each of those statements was repeated in the CINC petitions filed October 8, 2024, which attribute them to Dr. Smith-Dewey by name. In performing these functions Dr. Smith-Dewey acted as a forensic investigator performing the State's child abuse investigative function under the arrangements alleged in this Complaint, and acted under color of state law. She is sued in her individual capacity.

20. Defendant, The Children's Mercy Hospital, ("CMH,") is a private Missouri not-for-profit corporation doing business as Children's Mercy Kansas City, with its principal hospital at 2401 Gillham Road, Kansas City, Missouri. CMH operates the SCAN program and employed, supervised, trained, and supplied the policies and systems under which Frazier and the other SCAN personnel acted, and through the SCAN program performs child abuse investigative functions for Kansas and Missouri child-welfare and law-enforcement agencies, including with respect to children residing in Johnson County, Kansas.

21. Other individuals participated in the conduct alleged herein, including a DCF Child Protection Specialist and other CMH personnel. Except for Dr. Smith-Dewey, who is named above, those individuals are not named as Defendants at this time. Plaintiffs reserve the right to amend to add parties as the facts developed in discovery warrant.

## IV. STATE ACTION: CMH'S MEDICAL-FORENSIC ROLE IN KANSAS INVESTIGATIONS

22. Child abuse pediatrics is a medical subspecialty in which CAPs perform primarily forensic and investigative work. In Kansas child-protection matters, CMH and its CAPs act

principally as forensic medical investigators: they evaluate evidence, classify injuries, consult with investigators, and provide opinions used to determine whether government intervention is required. In that role, they provide little or no actual medical treatment. However, their status as forensic investigators is concealed from CMH patients who are falsely told that the CAPs are clinicians who are part of the baby's multi-disciplinary team.

23. CMH has maintained formal relationships with Kansas DCF to perform these investigative functions on a continuing and organized basis.

24. In 2021, Kansas DCF funded CMH to operate a "Safe-Care Kansas" program. When DCF received certain allegations of physical abuse or neglect involving a young child, a DCF specialist submitted a medical referral for review by a CMH child abuse pediatrician, who provided recommendations concerning medical evaluation, detailed case review, and additional information about the alleged maltreatment. The program anticipated approximately 500 child referrals and 75 detailed case reviews per year, used federal child abuse funding, and placed CMH within the regular investigative process by which Kansas evaluated suspected abuse. Kansas DCF described Safe-Care Kansas as a working partnership with CMH. The program was renewed and expanded to additional Kansas counties and a broader age group, with additional public funding to CMH.

25. A later agreement between Kansas DCF and CMH became effective on August 30, 2024, approximately one month before F.B.'s admission. It required CMH child abuse physicians to provide medical-forensic training to Kansas prevention and protection personnel, addressing accidental versus inflicted bruises and burns, fracture patterns, head and abdominal trauma, neglect, sentinel injuries, injury documentation, photographs, CARE referrals, interpretation of medical-provider recommendations, and the investigative steps to be taken after those recommendations.

26. Kansas law separately provides that when a child abuse medical resource center recommends a CARE examination and a CARE provider determines that a child has been abused or neglected, the completed review is provided to DCF and law enforcement, and DCF must consider and include the review in recommendations concerning the child's care, safety, and placement. Kansas law, including K.S.A. 38-2210, further provides for the free exchange of information among the Secretary of DCF, law enforcement, and other entities with responsibilities concerning a child alleged to be in need of care. CMH and its SCAN physicians operated within and pursuant to this investigative framework.

27. CMH thus helped teach Kansas investigators how to identify and interpret suspected abuse and simultaneously supplied case-specific medical-forensic opinions to the same child-protection system. The agreements did not require Kansas DCF to obtain an independent medical review before acting on a CMH abuse opinion and did not identify any outside physician authorized to question, correct or override a SCAN conclusion before removal.

28. The recurring flow of referrals, information, recommendations, records, and training created an integrated system: DCF and law enforcement, who were trained by CMH, supplied their investigative information to CMH; SCAN, in turn, supplied an official forensic medical opinion; and Kansas investigators and DCF used that conclusion to determine whether to remove children and prosecute CINC proceedings. CMH retained control over its physicians, its internal protocols, the medical record, the formulation of the SCAN opinion, and the manner in which contrary medical information would be incorporated into or excluded from that opinion.

29. In F.B.'s case, on October 2 and 3, 2024, SCAN team members coordinated their activities with DCF Child Protection Specialist Kirsti Martin and with Mission, Kansas Police Detectives Mason and Palmieri, including scheduling and staging the parents' interviews, briefing

DCF and the detectives on the SCAN team's conclusions, and supplying the medical narrative on which the State's removal decision was based. DCF and law enforcement delegated to the SCAN team the medical-investigative function of determining whether F.B.'s findings were caused by abuse and then adopted the SCAN conclusions as the basis for State action, including the *ex parte* seizure of both children.

30. Defendants Frazier, Smith-Dewey and CMH knew that a definitive SCAN diagnosis of multiple episodes of child physical abuse would be treated by Kansas investigators as evidence of present danger and would predictably cause the removal of the diagnosed child's siblings as well as the diagnosed child.

31. By performing this established medical-investigative function jointly with Kansas DCF and law enforcement, Defendants Frazier, Smith-Dewey and CMH functioned as state actors performing a public function under color of Kansas law. In the alternative, each acted as a willful participant in joint activity with the State and its agents.

## V. THE HELFER SOCIETY, THE PEDIBIRN RESEARCH NETWORK, AND DEFENDANT FRAZIER'S ROLE

### A. The Helfer Society and its publication

32. The Helfer Society publishes The Quarterly, subtitled "Child Abuse Medical Update – A Publication of the Ray E. Helfer Society," in which Society-affiliated physicians review and characterize the child abuse medical literature for distribution to practitioners in the field.

33. Dr. Frazier is a member of the Ray E. Helfer Society and serves on the Editorial Board of The Quarterly.

34. The Editorial Board on which Dr. Frazier serves also includes, among others, Kent P. Hymel, M.D., the lead author and creator of the "PediBIRN" clinical prediction rules for pediatric

abusive head trauma, and is led by Executive Editor Stephen C. Boos, M.D. The Quarterly's editorial board thus places Dr. Frazier within the small cohort of physicians who author, validate, and then review for the profession the very literature on which child abuse determinations – including determinations rendered as forensic opinions to state agencies and courts –are based.

**B. Frazier's participation in the PediBIRN research program**

35. Dr. Frazier is a co-author of PediBIRN research publications, including Hymel et al., *Screening for pediatric abusive head trauma: Are three variables enough?*, Child Abuse & Neglect 2022;125:105518, and Hymel, Carroll, Frazier, et al., *Validation of the PediBIRN-7 clinical prediction rule for pediatric abusive head trauma*, Child Abuse & Neglect 2024;152:106799. The Quarterly's Executive Editor, Dr. Boos, is a co-author of the latter validation study.

36. The PediBIRN program continues to expand its institutional reach. The Child Abuse Pediatrics Network ("CAPNET"), a multi-site child abuse pediatrics research network, lists among its active projects a study, with Dr. Hymel as principal investigator, whose stated objective is to use the PediBIRN 4-variable clinical prediction rule's estimates of abuse probability to characterize and compare abusive head trauma evaluation, diagnosis, and reporting practices across participating CAPNET sites. On information and belief, multiple members of The Quarterly's Editorial Board also serve as principal investigators of CAPNET projects.

37. On information and belief, the structure described above operates as a closed, self-validating loop: a small, overlapping cohort of Helfer Society-affiliated physicians generates the data, authors the studies, validates the studies, reviews and endorses the studies in the Society's own publication, trains the subspecialty's fellows in the resulting framework, and then renders forensic opinions to state agencies and courts that invoke that framework as established medical consensus – without disclosing to those agencies and courts that the "consensus" is substantially

the product of the same physicians' own interlocking roles and not a valid exercise of the scientific method or peer review.

### C. Structural conflicts of interest

38. On information and belief, Dr. Frazier's professional standing, academic advancement, research program, fellowship-training role, and forensic practice are mutually dependent: her role in the Helfer Society and the PediBIRN research program sustains her authority as a forensic abuse evaluator, and her forensic determinations in individual cases in turn sustain the institutional legitimacy of the diagnostic framework she helps author and review.

39. On information and belief, CMH likewise holds a direct institutional and financial interest in the continued legitimacy of aggressive abuse determinations: its SCAN program is funded in part through its contractual forensic relationships with Kansas DCF, including the Safe-Care Kansas program described above, and its child abuse pediatrics fellowship – in which Dr. Frazier serves as Associate Program Director – depends on a steady forensic caseload.

40. On information and belief, neither Dr. Frazier nor CMH disclosed these structural conflicts of interest to DCF, to law enforcement, or to the Johnson County District Court when SCAN's conclusions in F.B.'s case were presented as neutral, definitive medical findings.

### D. The AAP diagnostic standards and the Helfer end-around

41. The American Academy of Pediatrics ("AAP") promulgates the national clinical standards governing the medical evaluation of suspected child abuse, including the standards applicable to the child abuse pediatrics subspecialty in which Dr. Frazier is certified. Well before October 2024, the AAP had displaced the older, presumption-driven model of abuse diagnosis and instructed that "pediatric practitioners have a responsibility to formulate a thorough differential diagnosis" when a child presents with findings suggestive of abusive injury, and that a final

diagnosis is reached "only after consideration of all the available clinical data." AAP Policy Statement, *Abusive Head Trauma in Infants and Children*, 145 Pediatrics e20200203 (Apr. 2020).

42. The AAP's companion clinical report, reaffirmed in 2021, instructs that "there are diseases that can be mistaken for child abuse," that identifying them "reduces false accusations of abuse," that in some cases doing so "will require consultation with pediatric subspecialists," and that the medical record should reflect "alternative diagnostic possibilities." Christian, *The Evaluation of Suspected Child Physical Abuse*, 135 Pediatrics e20150356 (May 2015).

43. On information and belief, the Helfer Society and its affiliated child abuse pediatricians, including Dr. Frazier, responded to these AAP standards not by conforming their practice to them but by creating and implementing unpublished policies, practices, and customs designed to preserve the discredited presumption-of-abuse model while giving lip service to the AAP requirements. These practices – referred to herein as the "Helfer playbook" – include: proceeding on the working presumption that unexplained findings are abusive; reaching and communicating a definitive diagnosis before the differential diagnosis required by the AAP is investigated; routing children under CAP evaluation away from medical services more likely to consider and document competing diagnoses; declining to obtain the subspecialty consultation the AAP standards contemplate before a definitive abuse determination; converting the qualified or exculpatory language in underlying records into unqualified diagnostic certainty when communicating with investigators; treating selected radiologic findings as "highly specific" for abuse while discounting or ignoring their known alternative causes; and declining to correct the diagnosis to the agencies and courts that received it when later-developed evidence undermines it.

44. The effect of the Helfer playbook is to circumvent the very standards promulgated by the professional body under whose authority the subspecialty operates: the CAP invokes the

authority of organized pediatrics while systematically disregarding the differential-diagnosis, subspecialty-consultation, and documentation requirements that organized pediatrics imposes.

**E. The institutional approach alleged in related litigation**

45. This same institutional approach is alleged, on behalf of other families and physicians, in related federal litigation against Helfer Society-affiliated child abuse pediatricians and their institutions: *Reynolds et al. v. Harper et al.*, No. 25-CV-754 (LMP/SGE) (D. Minn.) (motion-to-dismiss order at 2026 WL 622283 (D. Minn. Mar. 5, 2026)); *Ramirez v. Harper et al.,* No. 25-CV-2266 (LMP/SGE) (D. Minn.); *Sharon v. Harper et al*., No. 25-CV-04603 (LMP/SGE) (D. Minn.); and *Marshall et al. v. Harper et al*., No. 0:26-cv-03461 (LMP/SGE) (D. Minn.). The *Marshall* complaint alleges in detail that Dr. Nancy Harper and other Helfer Society members created and implemented the Helfer playbook to preserve the presumption-of-abuse model displaced by the AAP's diagnostic guidance; the *Sharon* complaint alleges that a University of Minnesota pediatrician was terminated for documenting the differential diagnoses the AAP standards require.

46. Dr. Nancy S. Harper, the lead defendant in *Reynolds, Ramirez, Sharon, and Marshall,* and Defendant Frazier are, on information and belief, co-authors within the PediBIRN research literature and colleagues within the national child abuse pediatrics fellowship-training network. Both trained in, teach, and apply the same diagnostic framework.

47. On information and belief, Dr. Frazier adopted and implemented this same institutional approach – the Helfer playbook – at CMH's SCAN program, including in her supervision and training of SCAN fellows and in F.B.'s case, where, as alleged with particularity below, each feature of the playbook appears in the record: the diagnosis preceded the workup; radiology qualifiers were stripped; the AAP-required differential diagnosis, including the connective-tissue family history and the reported accidental mechanism, was neither investigated

nor disclosed; no subspecialty consultation relevant to bone fragility or connective-tissue disease was obtained before the definitive diagnosis; and the diagnosis was never corrected.

## VI. NOTICE: THE LYMAN CASE AND OTHER PRE-EXISTING WARNINGS

48. Before October 2024, CMH and Dr. Frazier were on notice of the danger that an unchecked SCAN abuse opinion, formed without complete consideration of alternative medical explanations, could cause wrongful arrest, prosecution, and family separation.

49. In 2021, published reporting in the Kansas City area documented cases of child abuse misdiagnosis at CMH resulting in the separation of families. In 2022, a bill was introduced in the Missouri Legislature directed at protecting families from wrongful child abuse determinations involving CMH.

50. In an earlier Kansas matter, a CMH child abuse assessment rendered by Dr. Frazier was used in the investigation and prosecution of Christopher Lyman, a caregiver, for an infant's death. On January 17, 2023, the District Court of Geary County, Kansas vacated Mr. Lyman's murder and child abuse convictions, finding that exculpatory evidence, including emails authored by Dr. Frazier, had been suppressed in a prosecution built on the CMH SCAN abuse diagnosis that Dr. Frazier rendered. On July 12, 2023, after the State's own retained pathologist concluded that the child had died of natural causes, the charges against Mr. Lyman were dismissed after he spent more than nine years in prison.

51. The 2023 vacatur and dismissal occurred before F.B.'s admission. On information and belief, Dr. Frazier and CMH learned of and received information concerning that outcome, yet neither changed the SCAN team's diagnostic, disclosure, or correction practices before F.B.'s presentation in October 2024, and Dr. Frazier remained a senior SCAN physician participating in and shaping the team's practices.

52. Subsequent events have confirmed what Dr. Frazier and CMH already knew. On February 25, 2026, the District Court of Geary County, Kansas (Sexton, J.) granted Mr. Lyman a Certificate of Innocence and ordered his records expunged, finding that the infant died of natural causes from a misdiagnosed fungal infection, that there was no evidence of any kind that Mr. Lyman committed the crime, that Dr. Frazier had "rushed to judgment," and that Dr. Frazier's presentation was "unimpressive to this court." The State of Kansas thereafter agreed to pay Mr. Lyman more than $1.1 million for his wrongful conviction.

53. Mr. Lyman's federal civil rights action arising from that prosecution, *Lyman v. Odell*, No. 25-2023-EFM-RES (D. Kan.), names Dr. Frazier as a defendant. On August 4, 2026, the Court denied Frazier's motion to dismiss in full, holding that the complaint's allegations against her – accepted as true at that stage – state claims for relief under 42 U.S.C. § 1983.

## VII. FACTUAL ALLEGATIONS

### A. The family

54. In October 2024, Sarah Goble and Brian Boxx lived in Mission, Johnson County, Kansas, with their two-month-old son F.B. and Ms. Goble's nine-year-old daughter S.G.

55. F.B. was born at full term on July 11, 2024. He was seen regularly by his pediatrician, Dr. Jodi VanGundy, and no concern of abuse or neglect had ever been raised by any physician, teacher, family member, or other person concerning either child or either parent. DCF had no prior history with the family.

56. Until mid-September 2024, F.B. was cared for exclusively by his parents and occasionally his maternal grandmother, Kim Goble. Beginning September 23, 2024, a nanny, Anita Scheuring, assisted with F.B.'s care three days per week.

57. In mid-September 2024, S.G., who was approximately 4 feet 7 inches tall and weighed approximately 72 to 75 pounds, fell forward while carrying F.B., striking the edge of a sofa and landing on top of F.B.'s right side with him still in her arms.

**B. October 1–2, 2024: the parents seek medical care**

58. On October 1, 2024, F.B. was fussier than usual. He fed normally at approximately 8:00 p.m. and was put to bed. He woke at approximately midnight, his normal feeding time, but sounded congested, would not feed from breast or bottle, and later vomited forcefully. The emesis contained a small amount of brown-tinged material thought to be old blood.

59. At approximately 4:00 a.m. on October 2, 2024, Plaintiffs took F.B. to the emergency department at a Saint Luke's facility in the Kansas City area. An abdominal x-ray showed dilated, gas-filled bowel loops and a chronic right-sided rib fracture with callus – a healing fracture that predated that night. F.B. was discharged home with a diagnosis of vomiting, unspecified type.

60. When F.B. remained unable to swallow, Dr. VanGundy recommended that the parents take F.B. to the emergency department. While Plaintiffs were attempting to administer Tylenol by syringe as the pediatrician directed, F.B. briefly stopped breathing. His parents immediately responded, F.B. resumed breathing, and his parents took him directly to CMH, arriving at approximately 9:00 a.m. on October 2, 2024.

61. At no point did the parents delay, resist, or attempt to avoid medical care. They sought care at three different providers within twelve hours at their pediatrician's direction.

62. None of the providers who saw F.B. before CMH expressed any concern that he had been abused. The first emergency department obtained a chest x-ray, observed the healing rib finding, and neither made an abuse referral nor restricted the parents in any way; the family's

pediatrician likewise directed the parents onward for treatment of the feeding problem, not out of any concern about the parents. Suspicion of abuse originated only at CMH.

63. On information and belief, the initial hotline report of suspected abuse was made by Dr. Strickler, a pediatrician involved in F.B.'s emergency care. Dr. Strickler has since apologized to the family and stated, in substance, that he was forced to do something he did not feel comfortable doing. On information and belief, Dr. Strickler was pressured to conform his reporting to the abuse assessment advanced by CMH's SCAN personnel, in the same manner alleged of Helfer-affiliated child abuse pediatricians and their institutions in *Reynolds v. Harper* and the related litigation described above: treating physicians and frontline providers are conscripted into, and required to defer to, the child abuse pediatrician's conclusion.

**C. The CMH evaluation**

64. At the CMH emergency department, F.B. was described in the medical records as alert, responsive, cooing, and babbling. Based on the healing rib fracture noted on the Saint Luke's x-ray, CMH ordered a child abuse workup, and the SCAN team was consulted. Once the workup began, SCAN personnel assumed responsibility for the medical-forensic assessment that would be supplied to Kansas DCF and law enforcement.

65. A skeletal survey performed October 2, 2024, was reported as showing fractures of ribs and of the distal right radius, and irregularities of the metaphysis of the left tibia and right humerus described as healing "metaphyseal" fractures. The radiology reporting for the rib findings included qualified language, including that certain rib fractures "may be" acute and that the fourth rib fracture was "questionable."

66. A head CT performed October 2, 2024, was negative; there was no intracranial injury of any kind. An abdominal CT showed a healing sixth rib fracture, a nondisplaced fifth rib

fracture, and a questionable fourth rib fracture, all on the right side, with no injury to any internal organ.

67. An orthopedic consultation reported that F.B. did not react or become upset with palpation or manipulation of his right wrist, arms, or legs. No orthopedic treatment was needed or provided for any reported fracture. A physical examination later on October 2, 2024 described F.B. as alert and interactive, grossly atraumatic, moving all extremities well, with no tenderness to palpation of any extremity.

68. A nasopharyngeal scope examination identified a small lesion in F.B.'s throat. In an addendum to the medical record, the CMH otolaryngology ("ENT") physician who examined the lesion stated that as of the morning of October 3, 2024, the lesion was already healing and was likely a few days to a week old. The lesion required no treatment.

69. Other than approximately one day of IV fluids while food was withheld pending the ENT examination, F.B. received no medical treatment of any kind during his six-day stay at CMH. Once cleared to eat on the morning of October 3, 2024, F.B. fed well and without difficulty. F.B.'s six-day hospital stay was primarily for the purposes of a forensic workup as opposed to treatment of an actual or perceived medical condition.

70. Dr. Smith-Dewey personally walked the parents through F.B.'s x-ray images. During that review she repeatedly misidentified the anatomy shown, pointing to findings on the wrong limb, and the parents – laypeople – had to correct her more than once. That experience is what prompted the parents to begin asking for a second opinion.

71. While the family was confined at CMH, two physicians informally reviewed images of F.B.'s scans at the family's request. Both reported that F.B.'s bones appeared abnormal and that the findings were not consistent with inflicted trauma; one reported that the claimed

fractures had been overstated. One of the two reviewers was Dr. Julie Mack, a radiologist who subsequently conducted a formal review of F.B.'s imaging and concluded that the SCAN team had misdiagnosed nearly all of the claimed fractures. When Ms. Goble reported the informal reviews to CMH staff and asked that additional testing be performed, staff dismissed the request and told her, in substance, that further testing was unnecessary because F.B. had been abused.

72. F.B.'s vital signs were taken incorrectly during the CMH admission, and as a result the chart at one point records him as malnourished, a description contradicted by the record as a whole and by every subsequent evaluation. The family's pediatrician contacted Dr. Smith-Dewey almost immediately, told her in substance that the abuse assessment was wrong, and pointed out the vital-sign error. Defendants neither corrected the record nor revisited the diagnosis in response to the treating pediatrician's objection.

73. After F.B. was medically ready for discharge and before any court order was issued, CMH personnel refused to release the family. A CMH social worker told Ms. Goble that she would be arrested if she left the hospital with F.B. and her children would be placed in Missouri foster care, where it would be hard for her to get them out, since the family lives in Kansas. No signed safety plan was in place; no reason for the hold was given; and no court had authorized any restraint. On information and belief, the family – including F.B., who had been medically discharged – was held at the hospital solely to preserve custody of F.B. pending the ex parte hearing that produced the October 8, 2024 orders. At that point in time, Plaintiffs were in custody.

**D. The diagnosis preceded and displaced the workup**

74. By no later than the morning of October 3, 2024, and before the medical workup was complete, the SCAN team had concluded and documented that F.B. was the victim of abuse.

75. The inpatient SCAN consultation was performed by Dr. Smith-Dewey. The note states that the case was discussed with Dr. Frazier, that Dr. Frazier separately examined F.B., and that Dr. Frazier agreed with the findings, interpretation, impression, and plan. Dr. Frazier signed and verified the consultation and was personally responsible for the diagnosis and recommendations communicated through it.

76. Upon information and belief, notwithstanding the recitations in the SCAN consultation, Dr. Frazier did not physically see or examine F.B. before the diagnosis was rendered, approved, signed, and communicated. Upon information and belief, the recitation that she did so was false and served to bolster the credibility and apparent thoroughness of the SCAN report. That practice – the supervising child abuse pediatrician endorsing forensic conclusions, and being recorded as a participating examiner, without independent clinical evaluation – is consistent with the Helfer playbook approach alleged above and with the practices alleged of Dr. Harper in the related Minnesota litigation.

77. The SCAN consultation concluded, "[F.B.] has multiple injuries that are highly specific for inflicted trauma including rib fractures and classic metaphyseal lesions/fractures. [F.B.'s] injuries are consistent with multiple occurrences of child physical abuse."

78. In reaching and communicating that conclusion, the SCAN team – under Dr. Frazier's leadership – converted the qualified findings of CMH's own radiologists, including "may be" acute, "questionable," and "suggesting," into definitive, unqualified diagnostic assertions.

79. The SCAN diagnostic communications did not disclose that the reported fractures were asymptomatic, caused F.B. no observable pain or loss of function, and required no treatment; did not disclose that the throat lesion had been assessed by the treating ENT physician as already healing and days to a week old; and did not identify, investigate, or disclose any accidental or

medical differential explanation for the findings, maternal history bearing on bone fragility and connective-tissue disease, or the possibility of a viral etiology for the throat lesion.

80. The SCAN team did not obtain, and did not await, subspecialty evaluation relevant to bone fragility or connective-tissue disease before rendering and communicating a definitive diagnosis of abuse. The diagnosis of multiple inflicted episodes depended on the propositions that the fractures were of different ages and that the metaphyseal irregularities were actual fractures. Neither proposition was established, and each was later contradicted by CMH's own follow-up imaging and by independent review.

81. Ms. Goble told the SCAN team she had several issues in her prior medical history that a reasonable physician would have inquired into further, especially with regard to joint dislocations and bone breaks. Those particular occurrences in her history were red flags, alerting any reasonable physician to the need for a thorough family medical history. A contemporaneous nursing note documents the parents' request for bone-disease testing. Upon information and belief, the SCAN records instead state that Ms. Goble reported no such history. Those records falsified the history Ms. Goble actually gave, and Defendants used the falsified history – the asserted absence of any family history of bone fragility – to create and to maintain the false child abuse diagnosis.

82. The conduct alleged in this Section is the Helfer playbook approach alleged above: the diagnosis preceded the workup, exonerating qualifiers were stripped, the differentials were neither investigated nor disclosed, and – as alleged below – the false and unsupported forensic diagnosis was never corrected or subjected to any further review. Indeed, the diagnosis was essentially cast in stone.

**E. The October 3, 2024 briefing to DCF and law enforcement**

83. On October 2, 2024, DCF received a report of suspected physical abuse of F.B. stating that F.B. had presented to the CMH emergency room with three rib fractures, three arm

fractures, a leg fracture, and an abrasion in the back of his throat concerning for abusive injury. That description significantly overstated the imaging findings.

84. On October 2, 2024, DCF Child Protection Specialist Kirsti Martin met the family at CMH. On October 3, 2024, Ms. Martin returned to CMH with Mission Police Detectives Mason and Palmieri. When they arrived, the SCAN team was showing the parents photographs of F.B.'s reported injuries. The SCAN team then briefed Ms. Martin and the detectives on F.B.'s "official diagnosis."

85. During that briefing Dr. Smith Dewey stated that F.B. had a healing fracture of the right lateral sixth rib, new fractures of the right fourth and fifth ribs, a healing fracture of the left tibia, a healing fracture of the right radius, and associated bruising and petechiae; that all healing fractures were more than ten to twelve days old; and that new fractures had occurred within the last ten days – thereby representing to the State that F.B. had been injured on at least two separate occasions.

86. In fact, as CMH's own imaging showed and, as subsequent imaging confirmed, the rib and radius fractures all showed healing responses at presentation, were consistent with a single event, and there was no medical basis to represent to investigators that the fractures were of definitively different ages.

87. Dr. Smith-Dewey's briefing further falsely attributed the metaphyseal findings to "yanking, tugging and pulling," the rib findings to "smooshing" or "squeezing" with force, and other findings to "blunt force trauma." These findings were stated as established fact. No witness, disclosure, medical or physical evidence supported any such mechanisms, and the metaphyseal irregularities showed no healing response on initial or follow-up imaging and therefore could not reliably be characterized as fractures at all.

88. Dr. Smith-Dewey's briefing stated that screening lab work for bleeding risk and bone fragility had been obtained and was "not indicative of an underlying medical condition," thereby communicating to the State that any medical causes had been excluded. In fact, no screening laboratory panel or radiographic appearance can exclude bone fragility, a limitation the SCAN team knew or recklessly disregarded.

89. Dr. Smith-Dewey's briefing stated that the SCAN team was "able to confirm" that the laceration in F.B.'s throat was caused between 8:00 p.m. and midnight on October 1, 2024 – the window in which only the parents and S.G. were in the home. That statement was false and known to be false, or was made with reckless disregard for the truth: CMH's own ENT physician had documented that the lesion was already healing and likely days to a week old as of the morning of October 3, 2024, and no medical method permitted "confirming" the lesion's occurrence within a four-hour window. The briefing further stated that the team could "confirm" that all healing fractures occurred before the nanny began working for the family, which, combined with the throat-lesion timing, functioned to narrow the universe of potential suspects to only the parents.

90. On information and belief, Dr. Frazier participated in formulating the diagnostic narrative communicated at the briefing; the briefing conveyed the diagnosis and conclusions of the SCAN consultation that Dr. Frazier had examined F.B. for, and approved, signed, and verified; and Dr. Frazier knew and intended that the SCAN conclusion would be briefed to DCF and law enforcement and used to determine whether both children would be removed from their parents' custody.

91. The effect and purpose of the briefing was to communicate to DCF and law enforcement that medical examination and testing had established abuse by the parents; that Dr.

Frazier not only concurred with this diagnosis, but that she had also examined F.B.; and that alternative explanations had been excluded; and that removal was required.

92. Based on the SCAN briefing, DCF and the detectives arranged stationhouse interviews of both parents and a forensic interview of S.G. at Sunflower House. In the parents' interviews on October 3 and 4, 2024, they fully cooperated, provided a consistent timeline, denied harming F.B., and identified everyone with access to him. S.G. reported that she felt safe with both parents and had never felt unsafe. The grandmother, the nanny, and S.G.'s teacher all corroborated the family's account and described attentive, loving parents. No interview produced any witness to abuse, any admission, any history of violence or domestic discord, or any other evidence of abuse. The entire case for removal rested on the SCAN team's knowing or reckless false forensic representations.

93. The interviews were conducted at the Mission, Kansas police department while the parents remained under the hospital ordered custody alleged above and under the express threat of arrest if they did not cooperate. The parents were interviewed separately; on information and belief, the interviews were recorded without their knowledge; and DCF and law enforcement conducted the questioning jointly, in the same room, as a single coordinated interrogation. In the circumstances – their infant held at the hospital, their movement restrained by threat of arrest, and the State's investigators questioning them in concert – the parents were in custody for constitutional purposes and no reasonable person in their position would have felt free to leave or to refuse.

94. During Ms. Goble's interview, the DCF investigator told her, in substance, that S.G. would also be taken from her unless Ms. Goble said that Mr. Boxx had injured F.B. Ms. Goble did not accuse her husband, and, as a result, both children were removed. The threat was made in

furtherance of the common plan alleged in this Complaint: to convert the SCAN diagnosis into State custody of both children by coercion where the evidence did not support it.

### F. The petitions and *ex parte* custody orders

95. On October 8, 2024, the Johnson County District Attorney's office filed CINC (Child in Need of Care) petitions as to F.B. (Case No. 24JC00406) and S.G. (Case No. 24JC00408) in the District Court of Johnson County, Kansas.

96. The factual basis of the petitions rested on the SCAN team's forensic representations, which the petitions repeated, including the statements that the healing fractures were more than ten to twelve days old; that new fractures occurred within the last ten days; that lab work was not indicative of an underlying medical condition; that the injury mechanisms were yanking, squeezing, and blunt force trauma; and that the throat laceration was "confirmed" to have been caused between 8:00 p.m. and midnight.

97. The petition as to F.B. alleged that he was unable to feed and needed hospitalization for multiple days. In fact, the medical records reflect that food was withheld pending the ENT examination, that F.B. was cleared to eat on the morning of October 3, 2024, and then fed well, and that F.B. received no treatment during the admission apart from approximately one day of IV fluids.

98. The petitions and supporting presentation omitted the ENT addendum dating the throat lesion to days to a week before admission; omitted that the fractures were asymptomatic and untreated; omitted the radiologists' qualifications; omitted maternal and family history bearing on bone fragility; and omitted that the first identification of any fracture was a chronic, healing fracture visible on the Saint Luke's x-ray taken when the parents voluntarily sought emergency care.

99. The petition as to S.G. rested on her residence in the same home as F.B. It contained no allegation that S.G. had ever been harmed, threatened, or endangered by anyone.

100. On October 8, 2024, on the presentation described above, the Johnson County District Court entered *ex parte* orders of temporary custody finding probable cause to believe the allegations in the applications were true, and both children were removed from their parents' custody. The orders' factual findings repeat, nearly verbatim, the narrative supplied from the SCAN briefing generated and led by Dr. Frazier.

101. At the time of removal, F.B. was an inpatient at CMH and safe; S.G. was a nine-year-old attending school, described by her teacher as thriving; and both parents had cooperated fully with every request of DCF and law enforcement. No emergency required removal of either child before notice and an adversarial hearing at which the actual medical records could have been examined.

102. The two petitions were not independently prepared. Side by side, the petition filed as to S.G. is substantially a copy of the petition filed as to F.B.: it recites the same statutory grounds, the same factual narrative of F.B.'s claimed injuries, and the same statements attributed to Dr. Smith-Dewey, and, with the case caption, the child's identifying information. Only the named father changed. It contains no individualized factual allegation concerning S.G. at all.

**G. Dr. Frazier's continued participation and the failure to correct**

103. Defendants' continued maintenance and transmission of the diagnosis after contrary evidence emerged constituted an ongoing constitutional violation.

104. On October 18, 2024, Dr. Frazier participated in and approved the SCAN follow-up visit and signed a note that continued to state that F.B. had been diagnosed with child physical abuse. At that follow-up, F.B. was well nourished, happy, interactive, and without bruising, petechiae, mouth injury, eye redness, tenderness, or other new injury.

105. A second skeletal survey was performed at CMH on October 18, 2024. While the initial survey report had described healing metaphyseal "fractures," the follow-up reporting

described sclerosis "suggesting" healing fractures, and the follow-up imaging showed no healing response at the metaphyses and no progression of periosteal reaction in the fourth and fifth ribs – findings inconsistent with the acute-plus-healing, multiple-event narrative the SCAN team had given the State.

106. On information and belief, neither Dr. Frazier nor Dr. Smith-Dewey nor any member of the SCAN team corrected, qualified, or withdrew any statement previously made to DCF, law enforcement, or the Johnson County District Court after the October 18, 2024, imaging. Drs. Frazier and Smith-Dewey did not withdraw or materially qualify their forensic diagnosis of multiple occurrences of physical abuse after the follow-up information undermined essential parts of the original theory.

107. CMH repeatedly furnished the SCAN records to Kansas DCF, subject to restrictions designating SCAN notes and transmittals as "protected" records that recipients could not forward, print, or copy. Those records continued to identify child physical abuse as the diagnosis and reinforced the basis for continued State custody.

108. On information and belief, no vitamin D testing was performed on F.B. until on or about October 18, 2024, after both children had been removed, notwithstanding that vitamin D status is among the most basic laboratory evaluations for an infant presenting with multiple asserted fractures, and notwithstanding the representation to DCF and law enforcement on October 3, 2024 that screening lab work for bone fragility had been obtained and had excluded any underlying medical condition.

109. No genetic or connective-tissue evaluation was ordered before the diagnosis was rendered or at any time during the SCAN team's involvement, despite the maternal medical history

of bone fragility and joint instability reported to the team. On information and belief, F.B. is believed to have Ehlers-Danlos syndrome.

110. CMH also failed to identify F.B.'s craniosynostosis – a cranial condition that can be serious if not timely identified, and which was subsequently diagnosed by an out-of-area specialist to whom the family had to travel. On information and belief, the condition was missed because the SCAN-directed evaluation was organized to confirm abuse rather than to diagnose and treat the child's actual medical conditions.

111. During the family's separation, the parents obtained and presented to the State expert medical explanations for F.B.'s findings, including bone fragility, demineralization, and the misidentification of claimed fractures. Defendants neither considered those explanations nor corrected their diagnosis in response. On information and belief, that refusal was not an oversight but was intentional and consistent with the Helfer-affiliated customs and policies alleged above, under which the abuse determination, once rendered, is defended rather than re-examined.

**H. The separation**

112. Following the October 8, 2024 orders, the children were placed in DCF custody. Over the following weeks S.G. was moved through four different homes in a single month. S.G.'s removal and multiple placements caused her to suffer severe emotional distress, fear, loss of safety and loss of family emotional support and upbringing. S.G. has required therapy to cope with the severe emotional distress caused by the trauma described herein, including the removal from her family and multiple placements.

113. DCF initially refused to approve the children's grandmother for custody or supervision. After she was approved, the children lived with her, first in her small apartment and later in the family home, with the parents permitted only supervised contact and required to leave the house when the children went to bed. Sarah and Brian returned each morning to prepare

breakfast and help the children begin the day. Their ability to parent, comfort, and reside with their children remained controlled by DCF and the court.

114. The parents complied with every requirement, evaluation, and case-plan task requested of them by DCF and its contractor, KVC. No independent evidence of abuse ever emerged.

**I. Separation continued despite The State's own findings**

115. On January 31, 2025, DCF issued its Notice of Department Findings. DCF did not substantiate either parent for physical abuse. DCF substantiated physical abuse against an "Unknown Perpetrator" and substantiated the parents only for "lack of supervision" – a finding that rested on the same occult, internal, asymptomatic medical findings that could not be seen without imaging or a scope, that no parent could have observed or prevented, and that CMH itself did not treat.

116. In late January and early February 2025, the family received a series of contradictory communications: they were told the investigation was closed and reunification would proceed; then, that the findings were unfavorable; then, that unsupervised visits were approved; and then, that DCF was cancelling the existing supervised visitation, reducing the parents' contact with their children from unlimited daily contact to two days per week, with Sarah permitted additional contact with F.B. for breastfeeding only, and requiring the breastfeeding visits be logged.

117. The restrictions disrupted the parent-child relationships, interfered with breastfeeding and ordinary caregiving, and caused severe emotional distress to the parents and both children.

**J. The exculpatory medical evidence**

118. Independent radiology review of F.B.'s imaging concluded that the rib and radius fractures were all healing, were likely all of the same age, were nondisplaced, involved no underlying organ or lung injury, and were consistent with a single minor-force event such as the reported fall while F.B. was in his sister's arms; and that the metaphyseal irregularities showed no periosteal reaction on initial or follow-up imaging and therefore could not be classified as fractures.

119. Physicians who reviewed F.B.'s imaging observed that his bones appeared somewhat demineralized for his age, warranting evaluation of family health history. His mother's history includes evaluation for osteoporosis due to frequent injuries in her youth and features of a heritable connective-tissue disorder.

120. In follow-up care after removal, F.B. was evaluated by Kansas Pediatric Neurology on January 29, 2025, and on February 28, 2025 by pediatric rheumatology at Washington University in St. Louis, which documented hypermobile "popping" joints, addressed Ehlers-Danlos syndrome, noted that hypermobility and Ehlers-Danlos syndrome cannot be formally diagnosed before approximately age six, and recommended genetics evaluation contingent on maternal testing.

121. None of this exculpatory medical information was developed, considered, disclosed, or investigated by the SCAN team before it rendered and communicated its diagnosis, and none of it was ever presented by either Defendant to DCF or to the Johnson County District Court in correction of the record they had created. Imaging alone could not establish normal bone strength, and the SCAN team's use of the term "highly specific" did not establish that abuse was the cause of the findings.

**K. Reversal, reunification, and favorable termination**

122. The children were reintegrated into the family home on or about April 4, 2025. By May 2025, DCF's written permanency plans stated that there were no safety concerns and that both

children were doing well at home. The State nevertheless retained legal custody and continued court involvement.

123. On September 18, 2025, Kansas DCF amended its findings, determining that physical abuse by an unknown perpetrator was unsubstantiated and that lack of supervision by Sarah and Brian was unsubstantiated. DCF expressly stated that it reversed the prior substantiation because of the new medical information, including the possible Ehlers-Danlos diagnosis and the sibling-fall history.

124. On September 23, 2025, the Johnson County District Court released both children from DCF custody and terminated its jurisdiction over both CINC proceedings. The DCF reversal and the court's termination ended the proceedings in the family's favor. No criminal charges were ever filed against Sarah Goble or Brian Boxx.

125. Had Defendants disclosed and fairly evaluated the material contrary facts before supplying a definitive diagnosis of repeated abuse, the Kansas authorities would not have had probable cause to remove either child or to continue the family's separation.

**L. CMH's policies, practices, customs, and ratification**

126. The handling of F.B.'s case was consistent with CMH's formal role and recurring practices in Kansas child abuse investigations. In that function, SCAN physicians do not operate as treating physicians; rather, they are investigators who are aligned with law enforcement. They evaluate children for the purpose of determining whether findings should be attributed to abuse, communicate conclusions to investigators and courts, and coordinate directly with detectives and child-welfare personnel during active investigations – including, as here, briefing investigators on an "official diagnosis" and shaping the course of interviews and removals.

127. On information and belief, CMH maintains policies, practices, and customs under which: (a) a SCAN consultation is triggered by findings such as an unexplained fracture and

proceeds on the working premise that such findings are abusive; (b) SCAN conclusions are communicated to investigators in definitive terms that omit the qualifications of the underlying radiology and clinical records; (c) differential diagnoses bearing on bone fragility, connective-tissue disease, and accidental mechanisms are not investigated before diagnosis and are not disclosed to investigators; (d) SCAN notes are segregated as "protected" records subject to restricted access and dissemination; (e) contrary or exculpatory findings developed after a SCAN diagnosis, including follow-up imaging, are not communicated to the agencies and courts that received the original diagnosis; and (f) no neutral specialist outside the SCAN chain of command is required to review an abuse diagnosis before it is used to support emergency removal.

128. On information and belief, these policies, practices, and customs implement at CMH the institutional approach to abuse determination described above, in which Dr. Frazier – as a senior SCAN physician, Associate Program Director of CMH's child abuse pediatrics fellowship, and a member of the Helfer Society's editorial apparatus – trained and supervised the SCAN team, including Dr. Smith-Dewey, teaching assessment of "physical abuse" bruises to non-medical personnel based on non-empirical science materials.

129. The result is a closed investigative environment in which the SCAN diagnosis, once rendered, is insulated from the ordinary checks of medicine – differential diagnosis, subspecialty consultation, second opinion, and correction – and operates on the State's decision-making with the force of established medical fact. The obvious risk of that structure is that an initial abuse hypothesis will become the official governmental narrative before competing medical explanations are investigated.

130. CMH had notice of that risk from its longstanding forensic work, from the 2021 published reporting, the 2022 Missouri legislation, and the 2023 *Lyman* vacatur and dismissal

involving Dr. Frazier, and from the direct role its conclusions played in removals and prosecutions. CMH nevertheless failed to adopt safeguards requiring meaningful consideration of unresolved differential diagnoses, independent review, and disclosure of material exculpatory medical evidence before its CAP opinions were used to remove children, and failed to train and supervise its SCAN physicians concerning the constitutional limits of their investigative role, the duty of candor and completeness in communications relied upon for the seizure of children, and the duty to correct.

131. CMH ratified the conduct in this case by treating the inpatient diagnosis as final, allowing Dr. Frazier to approve it, repeating it at follow-up, furnishing it to Kansas DCF, and failing to issue a timely correction after the follow-up evidence undermined material parts of the diagnosis.

**M. CMH's public representations to patients and families**

132. CMH holds itself out to the public, and to the families of its patients, as a uniquely expert and trustworthy institution. On its public website and in its patient- and family-facing materials, CMH represents, among other things, that it is "Built for kids"; that it is "a trusted provider of specialized pediatric care"; that its "mission is to improve the health, wellbeing and potential of children through expert care, research, education and innovation"; that it is "committed to improving outcomes and making every experience as comforting and supportive as possible"; that it is "the absolute best place for children's medical care in the Kansas City region and one of the best anywhere"; that it "lead[s] with science"; and that "[e]very decision," "[e]very innovation," and "[e]very interaction" is "designed with one goal in mind: delivering the best possible outcomes for every child, every time."

133. CMH publishes a page on its public website titled "Patient Rights and Our Promises to You," and materially identical text in its Handbook for Patients and Families. Among CMH's enumerated "promises to our patients" are, "We will tell you the truth"; "We will listen to you";

"Your care and safety are our most important goal"; and "You may talk freely with your health care team about your care and safety." CMH further promises that its personnel will, "Tell you who we are"; "Explain our job"; "Talk with you about why you are here"; "Tell you what might help you and what we believe might not help you"; and "Give you information you need to make decisions about your care." The page invites families to report "[i]f you think we have not kept our promises."

134. On information and belief, CMH made materially similar representations on its website and in its patient-facing materials at all times relevant to this Complaint, including in October 2024.

135. CMH's public description of the SCAN program itself is framed in therapeutic terms: the program is named "Safety, Care & Nurturing," and CMH describes its work as "identifying, preventing and treating all forms of child abuse." Within that same departmental description, CMH acknowledges that its SCAN team "collaborate[s] with social workers and governmental agencies throughout Kansas and Missouri" and "provide[s] forensic evaluations for the Kansas Department of Children and Families." That acknowledgment – CMH's own public admission of SCAN's contracted forensic function for Kansas DCF – corroborates the State-action allegations above. It appears, however, only within a departmental webpage; it is absent from the marketing representations and patient-facing "promises" directed to families, and – as alleged below – it was never disclosed to the Goble-Boxx family at the point of care.

136. These representations were material to the Goble-Boxx family. The family entrusted F.B. to CMH – the region's self-described premier pediatric institution – for the purpose of diagnosis and treatment of his feeding difficulty, in reliance on CMH's cultivated reputation for truthful, science-led, child-centered care.

137. The conduct alleged in this Complaint was contrary to each of those representations and promises. The SCAN personnel who evaluated F.B. did not "[t]ell" the family "who we are" or "[e]xplain our job": they did not disclose that they were functioning as forensic evaluators for the State, staging and briefing a joint abuse investigation with DCF and law enforcement while the family understood the encounter to be medical care. CMH did not tell the family the truth; it withheld from the family, and from the State, its own ENT physician's dating of the throat lesion, its own radiologists' qualifications of their findings, and the unresolved differential diagnoses. And its SCAN program did not lead with science; instead it applied the Helfer playbook and consciously disregarded the AAP guidelines on child abuse diagnosis in order to circumvent the protective effect of those guidelines.

**N. Injuries**

138. As a direct and proximate result of Defendants' conduct, Sarah Goble and Brian Boxx were separated from their infant son and from S.G.; lost the custody, care, companionship, and society of their children during irreplaceable months of F.B.'s infancy, including the disruption of breastfeeding; suffered severe emotional distress, humiliation, reputational injury, and fear of permanent loss of their children; and incurred substantial expenses, including for evaluations, therapy, legal and professional services, and compliance with State requirements.

139. As a direct and proximate result of Defendants' conduct, F.B. was seized and held in State custody during the first year of his life and deprived of the care, custody, and companionship of his parents.

140. As a direct and proximate result of Defendants' conduct, S.G. – who was not the subject of any abuse allegations – was seized and separated from her home and school life, moved through multiple placements, and has since been diagnosed with complex post-traumatic stress disorder ("CPTSD") as a result of her removal and the separation, including being moved through

four placements in a month, being deprived of her mother's care and companionship, and consequently suffering extreme emotional distress requiring therapy.

## VIII. <u>COUNT I: 42 U.S.C. § 1983 — FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS</u>

**(All Plaintiffs Against Defendants Frazier and Smith-Dewey)**

141. Plaintiffs incorporate the foregoing paragraphs.

142. Parents and children share a constitutionally protected liberty interest in familial association and in the care, custody, and companionship of one another, which may not be taken by the State without adequate pre-deprivation process except in an emergency posing an immediate threat to a child's safety.

143. No such emergency existed. F.B. was inpatient at the hospital; S.G. was a nine-year-old at home and school against whom no allegation of harm had ever been made; and the parents were cooperating with every investigative request.

144. Dr. Frazier and Dr. Smith-Dewey, acting under color of state law, deprived Plaintiffs of their liberty interests without adequate process by creating, authoring, approving, signing, verifying, and maintaining the medical-forensic diagnosis through which the State procured ex parte custody orders on a knowingly false, misleading, and materially incomplete presentation – including the fabricated throat-lesion timing, the definitive multiple-event fracture dating, the false representation that medical causes had been excluded, the omission of the ENT addendum, the radiology qualifications, the absence of symptoms and treatment, the documented bone-fragility differential, the parents' documented request for bone-disease testing, and the family history bearing on bone fragility and joint laxity, including the mother's reported lifetime history of fractures and joint dislocations.

145. A judicial finding of probable cause procured by deliberate falsehood and material omission provides no process at all. But for the false and misleading presentation created and maintained by Defendants, no reasonable judicial officer would have found probable cause to remove either child, and no reasonable physician in Dr. Frazier's or Dr. Smith-Dewey's position could have believed otherwise.

146. The knowing or reckless inclusion of false statements and omission of material facts in evidence used to secure a seizure violates clearly established law. *See Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990); *Malik v. Arapahoe County Department of Social Services*, 191 F.3d 1306, 1316 (10th Cir. 1999); *Halley v. Huckaby*, 902 F.3d 1136 (10th Cir. 2018).

147. Defendants' conduct was intentional, reckless, and undertaken with deliberate indifference to Plaintiffs' rights, and proximately caused the injuries alleged. Plaintiffs seek both compensatory and exemplary damages in amounts to be determined by a jury.

## IX. COUNT II: 42 U.S.C. § 1983 — FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS: FAMILIAL ASSOCIATION

**(All Plaintiffs Against Defendants Frazier and Smith-Dewey)**

148. Plaintiffs incorporate the foregoing paragraphs.

149. Dr. Frazier and Dr. Smith-Dewey intended to interfere with Plaintiffs' protected familial relationships: they directed their conduct at the family relationship itself, generating, approving, and communicating a definitive abuse diagnosis into the child-protection process with knowledge that the direct and intended consequence was the severance of the parents' custody of both children, and thereafter maintaining that diagnosis without correction while the separation continued.

150. Dr. Smith-Dewey separately and independently intended to interfere with Plaintiffs' familial relationships: she authored the definitive abuse conclusions; she personally communicated them to DCF and law enforcement at the October 3, briefing with knowledge that their direct and intended consequence was the severance of the parents' custody of both children; and she thereafter took no step to qualify or correct them while the separation continued. Her conduct was directed at the family relationship itself, not at the completion of a medical task.

151. Balancing Plaintiffs' interest in their family relationships against any legitimate state interest, Defendants' conduct – manufacturing diagnostic certainty unsupported by the medical record, suppressing exculpatory medical findings, extending the diagnosis to justify the seizure of a nine-year-old against whom nothing was alleged, and leaving the false record uncorrected while the family remained separated – unduly burdened and effected an unwarranted intrusion into those relationships, exceeded all bounds of legitimate investigative or medical judgment, and shocks the conscience.

152. Defendants' conduct was intentional, reckless, and undertaken with deliberate indifference to Plaintiffs' rights, and proximately caused the injuries alleged. Plaintiffs seek both compensatory and exemplary damages in amounts to be determined by a jury.

## X. COUNT III: 42 U.S.C. § 1983 — FOURTH AMENDMENT UNREASONABLE SEIZURE (F.B. ONLY)

**(Plaintiff F.B. Against Defendants Frazier and Smith-Dewey)**

153. Plaintiffs incorporate the foregoing paragraphs.

154. The removal of F.B. from his parents' custody on October 8, 2024, and his retention in State custody thereafter, was a seizure within the meaning of the Fourth Amendment.

155. The seizure was unreasonable because it was unsupported by probable cause or reasonable suspicion independent of the knowingly false statements and material omissions of the SCAN presentation created, approved, and transmitted by Defendants, who were acting under color of state law, and because no threat of imminent harm justified F.B.'s seizure – he was safely hospitalized and under continuous medical observation.

156. Defendants Smith-Dewey and Frazier caused the seizure by creating, approving, adopting, and transmitting the false and misleading medical narrative that was relied upon by DCF, incorporated into the petitions, and presented to the court as the primary basis for the ex parte custody orders.

157. Defendants' conduct proximately caused the injuries alleged.

## XI. COUNT IV: 42 U.S.C. § 1983 — FOURTH AMENDMENT UNREASONABLE SEIZURE (S.G. ONLY)

**(Plaintiff S.G. Against Defendants Frazier and Smith-Dewey)**

158. Plaintiff S.G. incorporates the foregoing paragraphs.

159. The removal of S.G. from her parents' custody on October 8, 2024, and her continued retention in State custody thereafter, constituted a seizure within the meaning of the Fourth Amendment.

160. That seizure was objectively unreasonable because it was undertaken without individualized probable cause, reasonable suspicion, or evidence of imminent harm specific to S.G.

161. At the time of the seizure: no allegation of abuse or neglect had ever been made as to S.G.; S.G. had reported, in the very petition seeking her removal, that she felt safe with both of her parents; her teacher described her as thriving; no behavioral, medical, or environmental concern suggested she was at risk; and Defendants possessed no evidence that S.G. had been harmed or was in imminent danger.

162. Instead, the seizure of S.G. was based solely on her status as the sibling of F.B. and on a generalized and unverified narrative of suspected abuse relating to another child. The State did not even prepare an individualized petition for her; as alleged above, her petition was substantially a copy of F.B.'s, with her name substituted.

163. Reliance on generalized suspicion, association, or the alleged injury of another child, without individualized evidence of risk, does not satisfy the Fourth Amendment and cannot establish probable cause to seize a separate child.

164. Defendants Smith-Dewey and Frazier caused the seizure by generating, approving, and transmitting a definitive abuse diagnosis concerning F.B. in a manner that foreseeably and directly resulted in the removal of both children, including S.G., despite the absence of any basis for doing so as to her.

165. No emergency circumstances existed that would justify the warrantless seizure of S.G., and no reasonable official in Defendants' positions could have believed that probable cause existed to remove her from her home.

166. As a direct and proximate result of Defendants' conduct, S.G. was unlawfully seized and deprived of her liberty, familial association, and security, and now carries a diagnosis of complex post-traumatic stress disorder, causing the injuries alleged herein. Defendants' conduct was intentional, reckless, and undertaken with deliberate indifference to Plaintiffs' rights, and proximately caused the injuries alleged. Plaintiffs seek both compensatory and exemplary damages in amounts to be determined by a jury.

## XII. COUNT V: 42 U.S.C. § 1983 — FOURTH AMENDMENT UNLAWFUL SEIZURE: PRE-ORDER CONFINEMENT

**(Plaintiffs Goble, Boxx, and F.B. Against Defendants Frazier, Smith-Dewey, and CMH)**

167. Plaintiffs incorporate the foregoing paragraphs.

168. After F.B. was medically ready for discharge and before any court order issued, Defendants, acting jointly with State investigators and under color of state law, confined Sarah Goble, Brian Boxx, and F.B. at CMH: CMH personnel refused to release the family, and a CMH social worker told Ms. Goble that she would be arrested and her children taken if she left. No signed safety plan was in place, no reason for the hold was given, and no exigency existed. as F.B. was medically cleared and his parents were cooperating with every investigative request.

169. After Brian Boxx'es interview with Mission PD, he was informed he was no longer allowed to be in the hospital with Finn. Additionally, the hospital would not allow any visitors, even S.G., so it was Sarah and F.B. in the hospital for four days.

170. A reasonable person in Sarah's position would not have felt free to leave. The confinement was a seizure of Sarah Goble and of F.B., accomplished by threat of arrest, without probable cause, without judicial authorization, and without any emergency justifying warrantless restraint.

171. On information and belief, the hold was imposed to preserve custody of F.B. pending the ex parte proceeding, at the direction of or in coordination with the SCAN team and the State investigators, and pursuant to CMH policy or custom governing suspected-abuse admissions.

172. As a direct and proximate result, Plaintiffs Goble, Boxx, and F.B. were deprived of their liberty and suffered the injuries alleged herein.

## XIII. COUNT VI: 42 U.S.C. § 1983 — CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS

**(All Plaintiffs Against Defendants Frazier and Smith-Dewey)**

173. Plaintiffs incorporate the foregoing paragraphs.

174. Acting under color of state law and in concert with one another, Defendants Dr. Frazier and Dr. Smith-Dewey and the DCF investigator, together with other participants not named

as Defendants, reached a meeting of the minds to pursue a common plan to remove F.B. and S.G. from their parents by presenting the State's investigators, prosecutors, and courts with a definitive medical narrative of abuse while excluding, omitting, and failing to correct the medical evidence inconsistent with that narrative.

175. The agreement is evidenced by the coordinated adoption of a single, uniform medical narrative despite contrary evidence in the underlying records, and by the shared failure to correct that narrative after contradictory findings emerged.

176. Defendant Smith-Dewey, acting in a forensic and investigative capacity as part of the SCAN program, participated directly in generating and communicating the initial abuse diagnosis and supporting narrative; in characterizing medical findings in definitive terms unsupported by the underlying records; and in coordinated briefing and communications with DCF and law enforcement, despite the existence of contrary medical evidence and the absence of a complete differential diagnosis.

177. Overt acts in furtherance of the conspiracy include the October 3, 2024 briefing; the coordination and staging of the parents' stationhouse interviews and S.G.'s forensic interview; the transmittal of the SCAN narrative into the petitions and custody applications; the presentation of that narrative to the Johnson County District Court; the segregation of SCAN materials as protected records; and the failure of each participant to correct the record after the October 18, 2024 imaging and the January 31, 2025 findings.

178. Overt acts in furtherance of the conspiracy further included: the preparation and staging of the investigative interviews of the parents and S.G.; the custodial conditions and recording of those interviews; the threat, during Ms. Goble's interview, that S.G. would be taken unless Ms. Goble accused Mr. Boxx; the transmission of the SCAN narrative into the DCF reports,

petitions, and custody applications; and the failure of each Defendant to correct the record after subsequent medical findings undermined the abuse diagnosis.

179. The conspiracy proximately caused the deprivations alleged in Counts I through V and the injuries alleged.

## XIV. COUNT VII: 42 U.S.C. § 1983 — MONELL/ENTITY LIABILITY (All Plaintiffs Against Defendant CMH)

180. Plaintiffs incorporate the foregoing paragraphs.

181. CMH, a private entity performing a state investigative function, acted under color of state law and is liable for its own policies, customs, practices, deliberate omissions, and ratification, not merely because it employed Frazier.

182. CMH maintained the policies, practices, and customs described above, including operating SCAN physicians as forensic investigators rather than treating physicians; permitting the SCAN program to control and supply the official abuse diagnosis to Kansas DCF and law enforcement; communicating diagnostic conclusions to the State in definitive terms stripped of the underlying records' qualifications; foreclosing or discouraging differential diagnosis and subspecialty consultation prior to issuing abuse determinations; requiring no independent review outside the SCAN chain of command before an abuse opinion was used to support emergency removal; segregating SCAN materials from ordinary medical-record access; and failing to correct diagnoses to the agencies and courts that received them.

183. CMH failed to train and supervise its SCAN physicians concerning the constitutional limits of their investigative role, the duty of candor and completeness in communications relied upon for the seizure of children, and the duty to correct, despite actual notice – through the 2021 published reports, the 2022 Missouri legislation, and the 2023 Lyman vacatur

and dismissal involving Dr. Frazier – that its SCAN practices had caused and would cause the wrongful separation of families.

184. CMH had actual knowledge that diagnoses of suspected child abuse are subject to significant variability, risk of misdiagnosis, and the need for careful, complete, and differential medical evaluation. Peer-reviewed medical literature, including work authored and relied upon by child abuse pediatricians, recognizes that no single clinical finding definitively establishes abuse and that diagnosis depends on the exclusion of alternative medical explanations; that assessments of abuse likelihood vary widely among physicians, including among experts evaluating the same facts; and that diagnostic uncertainty, variability across institutions, and risk of error are persistent and well-recognized features of the field. CMH's own clinical and educational materials likewise acknowledge that misdiagnosis, overdiagnosis, and incomplete evaluations occur and that careful differential diagnosis is required in suspected abuse cases.

185. The SCAN program's practice in this case also violated, and CMH's customs disregard, the American Academy of Pediatrics standards requiring the child abuse pediatrician's evaluation to account for the assessments of the child's treating physicians before an abuse conclusion is reached. As alleged above, F.B.'s own pediatrician contacted Dr. Smith-Dewey directly to dispute the diagnosis and to identify the vital-sign error, and the objection was disregarded without evaluation, correction, or documentation. On information and belief, disregarding treating-physician input is CMH SCAN custom and practice, not an aberration

186. CMH ratified the violations in this case by approving the initial SCAN conclusion, continuing the diagnosis after follow-up, transmitting the records to DCF, and failing to correct the conclusion.

187. Despite this knowledge, CMH maintained and enforced policies and practices that permitted and encouraged SCAN physicians to issue definitive abuse diagnoses while omitting material medical information and without requiring adherence to differential diagnostic protocols or independent review safeguards, creating a substantial and obvious risk that children would be misdiagnosed and families wrongfully separated.

188. These policies, practices, customs, failures, and ratification reflected deliberate indifference to the constitutional rights of families, were the moving force behind the violations alleged in Counts I through VI, and proximately caused the injuries alleged.

189. At the same time, CMH participated in and operated within a State-supported investigative and referral system, including the Kansas CARE framework, in which physicians performing child abuse evaluations were integrated into the State's child protection process, were trained and deployed specifically to evaluate suspected abuse, were compensated on a per-examination basis for conducting abuse evaluations, and were reimbursed for serving as the State's witness in cases of suspected child abuse. This structure further embedded SCAN physicians within the State's investigative function while failing to implement safeguards necessary to ensure diagnostic neutrality, accuracy, or constitutional compliance.

## XV. COUNT VIII: KANSAS LAW — MALICIOUS PROSECUTION OF CIVIL PROCEEDINGS

**(All Plaintiffs Against All Defendants)**

190. Plaintiffs incorporate the foregoing paragraphs.

191. CMH knew, or was deliberately indifferent to, the fact that within this system abuse diagnoses would be relied upon by DCF, law enforcement, and the courts as determinative evidence; that such diagnoses would directly result in the seizure of children and the separation of

families; and that the absence of required safeguards – independent review, complete disclosure of medical uncertainty, and correction of inaccurate findings – would foreseeably result in constitutional violations.

192. Defendants affirmatively procured and continued the CINC proceedings by supplying the official medical-forensic diagnosis and injury narrative on which Kansas investigators, prosecutors, and the court relied. Defendants did more than make a mandatory report: they undertook the medical investigation, classified the evidence, communicated the official diagnosis, advised the investigative process, performed follow-up, and continued to furnish records supporting State custody.

193. CMH failed to train and supervise its SCAN physicians concerning the constitutional limits of their role as State-integrated forensic actors, the duty of candor and completeness when providing medical conclusions used to justify the seizure of children, the requirement to account for diagnostic uncertainty and alternative medical explanations, and the obligation to correct false or misleading conclusions once contrary evidence emerged, despite actual notice – including prior instances of misdiagnosis by the SCAN team, most notably involving Dr. Frazier, published literature, and known risks within the field acknowledged in its own research – that the failure to do so would result in wrongful accusations of abuse and family separation.

194. A materially accurate assessment would not have established probable cause to allege multiple occurrences of inflicted trauma or to maintain either child in State custody.

195. Dr. Frazier knew that the SCAN conclusion excluded or materially minimized facts that undermined the multiple-abuse theory and knew that the conclusion would be used to separate the family. She approved and continued the diagnosis with the specific intent that Kansas authorities

rely on it to remove the children and maintain the CINC proceedings. The injury to the family was the intended consequence of the forensic opinion, not an accidental byproduct of treatment.

196. CMH authorized and ratified the conduct through its policies, its SCAN program, its transmission of the records, and its failure to correct the diagnosis. It is directly liable and, to the extent permitted by Kansas law, liable for acts performed by its agents within the scope of their employment.

197. CMH ratified the violations alleged in this case by approving and adopting the SCAN conclusions, by transmitting those conclusions into the State's investigative and judicial process, by maintaining the diagnosis after contradictory medical evidence was presented, and by failing to correct the record provided to DCF, prosecutors, and the court.

198. Defendants acted with actual malice, in bad faith, and with a specific intent to injure Plaintiffs by causing and maintaining the family separation on a materially incomplete medical record. The immunity available under K.S.A. 38-2223(f) to persons acting in good faith and without malice therefore does not apply.

199. The policies, practices, and customs of the SCAN program, together with CMH's failures to train and supervise and its ratification of the conduct alleged, reflected deliberate indifference to the constitutional rights of families, were the moving force behind the violations alleged in Counts I through VII, and directly and proximately caused the seizure of Plaintiffs' children and the resulting injuries.

200. The proceedings terminated in Plaintiffs' favor when DCF reversed all findings as unsubstantiated on September 18, 2025 and the Johnson County District Court released the children and terminated jurisdiction on September 23, 2025. DCF reversed its original substantiation on the

stated basis that it had been presented with medical information not previously available to it. The claim accrued upon favorable termination and is timely.

201. As a direct and proximate result, Plaintiffs suffered loss of liberty and family association, emotional distress, placement and therapy-related injury, legal and professional expenses, reputational harm, and other economic and noneconomic damages.

## XVI. COUNT IX: KANSAS LAW — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS / OUTRAGE

**(Plaintiffs S.G., Goble and Boxx Against All Defendants)**

202. Plaintiffs incorporate the foregoing paragraphs.

203. Defendants' conduct – manufacturing diagnostic certainty to brand cooperative parents as child abusers, procuring the seizure of a hospitalized infant and an unaccused nine-year-old, and maintaining the accusation without correction while the family remained separated – was intentional or in reckless disregard of Plaintiffs, was extreme and outrageous, and is atrocious and utterly intolerable in a civilized society.

204. Defendants' conduct was undertaken in bad faith and without the good faith required for any immunity or privilege afforded to reporters or participants in child abuse investigations under Kansas law, including K.S.A. 38-2223(f).

205. As a direct and proximate result, S.G., Sarah Goble and Brian Boxx suffered severe emotional distress of a kind no reasonable person should be expected to endure, together with the further injuries alleged.

## XVII. COUNT X: KANSAS CONSUMER PROTECTION ACT, K.S.A. 50-623 ET SEQ.

**(Plaintiffs Goble and Boxx Against Defendant CMH)**

206. Plaintiffs incorporate the foregoing paragraphs.

207. Sarah Goble and Brian Boxx are "consumers," and CMH is a "supplier" within the meaning of the Kansas Consumer Protection Act, K.S.A. 50-624. The provision of hospital services to F.B. for consideration was a "consumer transaction."

208. This Count is directed exclusively to the entrepreneurial, marketing, and business conduct of CMH – its public and patient-facing representations promoting the nature and quality of its services, and its concealment of the commercial and contractual character of its SCAN program – and not to the exercise of medical judgment or the breach of any professional duty. Plaintiffs do not assert under this Count a cause of action for personal injury or death resulting from medical negligence; the damages sought under this Count are exclusively the economic losses alleged below. The exclusion in K.S.A. 50-635(b) therefore does not reach this Count, and under K.S.A. 50-635(c) the burden of establishing any exclusion rests on CMH.

209. In connection with the consumer transaction, CMH engaged in deceptive acts and practices in violation of K.S.A. 50-626, including willful misrepresentations and willful concealment, suppression, and omission of material facts in the marketing and patient-facing representations through which CMH solicits and structures its consumer relationships: CMH marketed its services to consumers as truthful, science-led hospital care directed to the child's best outcome, and expressly promised in its patient-facing materials that its personnel would "[t]ell you who we are" and "[e]xplain our job," while willfully omitting from those consumer-facing representations, and from the transaction itself, that for families in the Goble-Boxx family's position the hospital encounter they were purchasing would be conducted in material part by personnel functioning as contracted forensic evaluators for Kansas DCF; that the encounter would be staged and briefed as a joint State investigation; and that SCAN materials generated in the encounter would be segregated as "protected" records shielded from the family's ordinary access

to their own child's chart. CMH's acknowledgment of SCAN's forensic function for Kansas DCF, buried within a departmental webpage and absent from its consumer marketing, its published "promises," and the point of care, did not cure the deception; it confirms CMH knew the material fact it was omitting.

210. CMH's acts and practices were willful and material, and Plaintiffs were aggrieved by them: in reliance on CMH's representations, they entrusted F.B. to CMH and participated candidly in what they understood to be his medical care to their detriment.

211. As a direct and proximate result, Plaintiffs suffered economic damages, including out-of-pocket expenses for medical evaluations, therapy, travel, compliance with State requirements, and legal and professional services necessitated by the deceptive conduct.

212. Plaintiffs seek their actual economic damages or civil penalties as provided by K.S.A. 50-634 and 50-636, whichever is greater, together with reasonable attorneys' fees under K.S.A. 50-634(e).

## XVIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and award:

a. Compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial;

b. Punitive damages against Defendants Frazier and Smith-Dewey and against Defendant CMH to the extent permitted by law;

c. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and K.S.A. 50-634(e);

d. Actual damages or civil penalties under K.S.A. 50-634 and 50-636, whichever is greater;

e. Pre- and post-judgment interest as allowed by law; and

f. Such other and further relief as the Court deems just and proper.

## XIX. JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## XX. DESIGNATION OF PLACE OF TRIAL

Pursuant to D. Kan. Rule 40.2, Plaintiffs request Kansas City, Kansas as the place of trial.

Dated: Sept. 28, 2026

Respectfully submitted,

/s/ Cheryl A. Pilate
Cheryl A. Pilate, KS # 14601
MORGAN PILATE LLC
926 Cherry Street
Kansas City, Missouri 64106
Phone: 816-471-6694
Fax: 816-472-3516
cpilate@morganpilate.com

Jerome M. Reinan (pro hac vice forthcoming)
Colorado Bar No. 24322
Law Offices of J.M. Reinan, P.C.
1437 High Street | Denver, Colorado 80218
(303) 894-0383 | jreinan@reinanlaw.com

*Application for admission pro hac vice forthcoming*

***ATTORNEYS FOR PLAINTIFFS***

**CERTIFICATE OF SERVICE**

I, Cheryl A. Pilate, hereby certify that a true and accurate copy of the foregoing document was served on the Clerk of the Court via the CM/ECF system on September 28, 2026.

/s/ Cheryl A. Pilate